**Susan S. BROWN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–9529.**

Court of Appeals of Alaska.

April 18, 2008.

Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

The defendant in this case, Susan S. Brown, was stopped by a state trooper for a traffic infraction (insufficient illumination of her rear license plate). However, Brown was not informed of the reason for the stop. The trooper asked Brown to produce her driver's license, and then he took the driver's license back to his patrol car to see if the

license was valid and if there were any outstanding warrants for Brown's arrest. After assuring himself that Brown was validly licensed and that there were no warrants for her arrest, the trooper decided to simply issue a warning to Brown. The trooper then returned to Brown's car.

But rather than explaining the reason for the stop, and announcing his decision to let Brown off with a warning, the trooper instead asked Brown for permission to search her person and her vehicle for weapons and drugs. Brown gave permission, the search was conducted, and the trooper found a crack cocaine pipe in the lining of Brown's coat.

In this appeal, Brown concedes that she was properly stopped for the traffic infraction. However, she asserts that the circumstances surrounding her encounter with the trooper were implicitly coercive, and that her consent to the search was therefore not valid.

The United States Supreme Court has declared that, even when a traffic stop is supported by probable cause, routine traffic stops should be viewed as a species of investigative stop rather than a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440–41 & n. 29, 104 S.Ct. 3138, 3150 & n. 29, 82 L.Ed.2d 317 (1984). For this reason, traffic stops are governed by the principles expounded in *Terry v. Ohio*[1] limiting the scope and duration of investigative stops. *Id.*

(See *Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), where the Supreme Court held that, even when an officer might lawfully subject a motorist to a full custodial arrest for a traffic offense, the officer can not lawfully conduct the kinds of searches incident to arrest that would be authorized under the Fourth Amendment unless the officer actually performs a full custodial arrest. If the officer instead decides to conduct a routine traffic stop, then the officer's authority to search is limited by the rule of *Terry v. Ohio*. *Knowles*, 525 U.S. at 114, 118–19, 119 S.Ct. at 486, 488.)

Applying the principles of *Terry*, a traffic stop "must be temporary and [must] last no longer than is necessary to effectuate the purpose of the stop". *Florida v. Royer*,

460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion). Moreover, a police officer's conduct during the stop must be "reasonably related in scope" to the circumstances that justified the stop in the first place. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884). The stop becomes unreasonable—and thus constitutionally invalid—if the duration, manner, or scope of the investigation exceeds these boundaries. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26.

But federal and state courts have reached different conclusions regarding how these principles apply when an officer asks a motorist's permission to conduct a search for controlled substances or other contraband during a traffic stop.

As we explain in more detail below, many courts have reasoned that the mere asking of questions—even a question such as, "May I search you and your vehicle for drugs?"—does not alter the duration or scope of the intrusion upon a motorist's freedom and privacy that normally accompanies a traffic stop. According to these courts, even when there is no reason to suspect that the motorist is carrying drugs, it is nevertheless proper for the officer to question the motorist about drugs, and to request the motorist's permission to conduct a drug search, so long as the officer's questioning does not extend the duration of the traffic stop beyond what would normally be required to investigate and respond to the observed traffic infraction.

Moreover, when these courts assess the validity of the motorist's ensuing consent, they employ the "totality of the [objective] circumstances" test enunciated in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). This means that, absent specific coercive circumstances beyond those that normally attend a traffic stop, the motorist's ensuing consent to search will be deemed voluntary.

[1]. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Other courts, still working within the framework of federal law, have tried to clarify the application of the *Terry* principles to traffic stops by placing more specific limitations on a police officer's authority to request permission to search. For example, the Tenth Circuit follows the bright-line rule that forbids officers from requesting consent to search until the officer has returned the motorist's license and registration (thus impliedly alerting the motorist that the stop is nearing an end, and that the motorist will soon be free to go).[2] In a similar vein, the Ohio Supreme Court attempted to regulate these requests by requiring the officer to first expressly advise the motorist that they would be free to go even if they did not consent to the search.[3] However, on petition for writ of certiorari, the United States Supreme Court held that the Fourth Amendment did not require this type of advisement.[4]

Finally, some state courts have turned to their own state law to regulate these situations—either forbidding outright any request for permission to search unless there is reasonable suspicion to support the request, or else restricting the circumstances in which such requests can be made without reasonable suspicion.

For the reasons explained in this opinion, we join the state courts that have decided that their state constitutions require greater restrictions on police authority in this situation than the restrictions imposed by the Fourth Amendment to the United States Constitution.

We reject the notion that, as long as a police officer's questions do not extend the expected temporal duration of a traffic stop, the legal nature of the stop remains unaltered even when an officer questions a motorist about other potential crimes and seeks permission to search the motorist and/or the vehicle. As shown by the facts of the present case, and as shown by the experiences of other states, motorists who have been stopped for traffic infractions do not act from a position of psychological independence when they decide how to respond to a police officer's request for a search. Because of the psychological pressures inherent in the stop, and often because of the motorist's ignorance of their rights, large numbers of motorists— guilty and innocent alike—accede to these requests.

Moreover, because traffic regulations are so numerous and detailed, most motorists will violate these regulations from time to time. In the present case, for instance, the defendant was stopped because the light illuminating her rear license plate was dirty.

Because the violation of traffic regulations is so frequent, and because motorists who are stopped for traffic infractions often accede to a police officer's request for permission to search, the Fourth Amendment rules governing traffic stops create the potential risk that law enforcement officers will compromise the privacy of many citizens. These Fourth Amendment rules potentially allow Alaska law enforcement officers to search dozens, and perhaps hundreds, of people and vehicles each day even though the officers lack any grounds to justify these searches.

For these reasons, we hold that the Alaska Constitution imposes greater restrictions on a police officer's authority to request a motorist's permission to conduct a search during a routine traffic stop. We conclude that an officer's questions about other potential crimes, and an officer's requests for permission to conduct a search, are significant events under the search and seizure provision of the Alaska Constitution, Article I, Section 14. More specifically, we conclude that, under the circumstances presented in this case, the officer conducting the traffic stop was prohibited from requesting Brown's permission to conduct a search that was (1) unrelated to the basis for the stop and (2) not otherwise supported by a reasonable suspicion of criminality.

**2.** See *United States v. Bradford,* 423 F.3d 1149, 1158 (10th Cir.2005).

**3.** *State v. Robinette,* 73 Ohio St.3d 650, 653 N.E.2d 695, 699 (1995).

**4.** *Ohio v. Robinette,* 519 U.S. at 38–40, 117 S.Ct. at 420–22.

*The facts of the traffic stop in this case*

At about 3:00 a.m. on November 24, 2004, State Trooper Maurizio Salinas stopped the vehicle driven by Susan S. Brown because the trooper observed that the vehicle's rear license plate was not properly illuminated.[5] Traffic at that time of the morning was sparse; in fact, Salinas's vehicle and Brown's vehicle were the only cars on the road.

Salinas informed Brown who he was, and he asked Brown for her driver's license. However, Salinas did not tell Brown why he had stopped her.

Salinas then asked Brown if she was carrying any weapons or drugs in her car. Brown responded that she did not have any such items in her car.

Carrying Brown's driver's license, Salinas walked back to his patrol car. He ran a check on the validity of Brown's driver's license, and he also checked to see if there were any outstanding warrants for her arrest. These checks showed that Brown was properly licensed and that there were no warrants for her arrest.

Having performed these checks, Salinas decided that he would simply give Brown a warning rather than issuing her a citation for the license-plate-illumination violation (of which Brown was still assumedly ignorant).

Salinas walked back to Brown's vehicle, but he still did not inform her of his reason for stopping her car, or of his decision to let her off with a warning. (Indeed, it is not apparent, from either the audio recording of the encounter or Salinas's later testimony at the evidentiary hearing, that Salinas handed Brown's driver's license back to her.) Instead, Salinas asked Brown where she was headed, and then he again asked Brown if she had any weapons or drugs. When Brown again denied possessing either weapons or drugs, Salinas asked her if she would mind if he performed a search for these items. Brown consented to this search.

Salinas directed Brown to step out of her vehicle, and then he conducted a search of Brown's person. Inside the lining of Brown's coat, Salinas found a crack pipe. Salinas then arrested Brown and, incident to this arrest, he searched Brown's purse (which was sitting on the passenger seat of her car). Inside the purse, Salinas found cocaine in a cigarette box.

The entire duration of Salinas's encounter with Brown, from the time he stopped her car to the time she consented to the search, was less than two and a half minutes. (Of course, the encounter became longer after Brown consented to be searched.)

During the court proceedings in this case, Salinas testified that he worked traffic patrol from 11:00 p.m. to 7:00 a.m., and that it was his practice to try to conduct a few consent searches each night during traffic stops. In other words, when Salinas conducted traffic stops, he would randomly ask drivers for permission to search for drugs and/or weapons.

When Salinas asked Brown for permission to conduct the search in this case, he was simply following this practice of randomly seeking permission to search. Salinas had no grounds for suspecting that Brown was carrying drugs on her person or in her car.

Brown asked the superior court to suppress the fruits of the two searches (the search of her person and the search of her purse). After the superior court upheld these searches, Brown and the State reached a plea agreement under *Cooksey v. State*.[6] Brown pleaded no contest to fourth-degree controlled substance misconduct (possession of cocaine), upon the understanding that she would be able to appeal the superior court's ruling on her suppression motion.

*The State's position in this appeal*

The State acknowledges that traffic stops are governed by the same *Terry* principles that limit the duration and scope of investigative stops. That is, the State acknowledges

---

**5.** Under 13 AAC 04.025(c), a vehicle's rear license plate must be illuminated by the taillight or some other white light (whenever the vehicle's headlights or auxiliary driving lights are illuminated) "so that it is clearly visible from a dis-

tance of 50 feet to the rear". Brown's license plate light was working, but it was dirty.

**6.** 524 P.2d 1251, 1255–57 (Alaska 1974).

that "a traffic stop may last no longer than necessary to accomplish its purpose and must be conducted by the least intrusive means [available] to accomplish its purpose."

Based on these principles, the State contends that the underlying issue in this case is not whether Trooper Salinas's questions about drugs, and his request for permission to conduct a drug search, were related to the reason for the traffic stop. Instead, the State argues, the issue is whether Salinas's questions and his request for permission to conduct a search "unreasonably extended the stop". The State contends that the answer to this question is "no" for three reasons.

First, according to the State, the traffic stop had not yet ended—for although Salinas had completed his investigation concerning the unlawful dimness of Brown's license plate light, and although Salinas had verified that Brown was properly licensed and did not have any warrants for her arrest, Salinas had not yet informed Brown of the reason he had stopped her, nor had Salinas issued either a citation or a warning to Brown.

Second, according to the State, Salinas's decision to seek Brown's permission for a drug search did not unreasonably extend the temporal duration of the stop. Obviously, any question that the trooper asked would extend the duration of the stop by a few seconds; here, for instance, the record indicates that Salinas's question and Brown's response consumed approximately twelve seconds. But the State asserts that the test under Fourth Amendment law is whether the trooper's questions extended the duration of the traffic stop to an *unreasonable* degree—and there are plenty of federal and state cases to support the State's position that a brief extension of a traffic stop does not make the stop unreasonable, so long as the total length of the stop does not exceed the

amount of time reasonably needed to accomplish its purpose.[7]

Third, the State contends that Salinas's questions to Brown about drugs, and his requests for permission to conduct a search, did not significantly alter the scope or intensity of the traffic stop. The State relies on cases such as *Muehler v. Mena*, 544 U.S. 93, 100–01, 125 S.Ct. 1465, 1472, 161 L.Ed.2d 299 (2005), and *United States v. Childs*, 277 F.3d 947, 949 (7th Cir.2002) (en banc), for the proposition that "questions [by themselves] are neither searches nor seizures"[8]—and that, for this reason, a police officer's act of engaging a motorist in brief questioning on other subjects and requesting permission to conduct a search does not alter the reasonableness (*i.e.*, the lawfulness) of a traffic stop.[9]

Under the State's analysis (*i.e.*, under the assumption that the trooper's questions about weapons and drugs, and his request for permission to search, did not unlawfully alter the scope or duration of the traffic stop), the final question is whether Brown's consent to the search was voluntary.

■ Under the Fourth Amendment, the voluntariness of a person's consent to search is assessed using the "totality of the [objective] circumstances" test enunciated in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Alaska Supreme Court adopted this test in *Frink v. State*, 597 P.2d 154, 167 (Alaska 1979).

In the present case, when Trooper Salinas requested permission to perform a drug search, Brown had not been told the reason for the traffic stop, nor had she been informed of Salinas's decision to let her go with a warning. Indeed, it is not clear if the trooper had even returned Brown's driver's

---

7. See the cases listed in footnote 9.

8. *Childs*, 277 F.3d at 949. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) ("mere police questioning does not constitute a seizure").

9. *Childs*, 277 F.3d at 954; *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir.2001) (confirming a police officer's authority to question a motorist on topics unrelated to the ground for

the traffic stop, so long as the duration of the stop is not significantly lengthened: "only unrelated questions which unreasonably prolong the detention are unlawful"); *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993) ("[W]e reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation.... [D]etention, not questioning, is the evil at which *Terry's* second prong is aimed.").

license. The State nevertheless maintains that the record demonstrates Brown's voluntary consent to the search.

The State notes that the entire encounter between Salinas and Brown was quite short, and that Salinas was cordial and polite throughout. The State further notes that, in *Frink*, the Alaska Supreme Court held that a person's consent to search can be valid even though the police do not inform the person of their right to refuse consent. Finally, the State notes that in *Robinette*, 519 U.S. at 39–40, 117 S.Ct. at 421, the United States Supreme Court ruled that a motorist temporarily detained for a traffic stop can validly consent to a search even though the police never inform the motorist that they will be free to leave even if they refuse to consent.

For all of these reasons, the State contends that the traffic stop was lawful and that Brown's consent to search was voluntary.

The State's position is eminently defensible under federal law. But for the reasons explained in the next section of this opinion, we conclude that federal law does not afford sufficient protection to motorists who are asked to consent to a search of their person, their vehicle, or their belongings during a traffic stop.

### Why we conclude that federal law does not adequately protect motorists

In times past, a "routine" traffic stop for an equipment violation (such as the one in this case) would normally include an investigation of the vehicle and/or questioning of the motorist to verify that the suspected equipment violation in fact existed. It would also generally include a request for the motorist's driver's license, registration, and proof of insurance; a computer or radio check to verify the validity of these documents; and the issuance of an appropriate citation or warning. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 9.3(c), Vol. 4, p. 378. To this list of routine investigative measures might be added a computer or radio check for outstanding warrants for the arrest of the motorist, as long as this check was done expeditiously, so as not to significantly extend the duration of the stop. *Id.* at pp. 381–82.

Questions concerning the driver's potential possession of drugs, or requests for permission to search either the driver's person or the vehicle for drugs, were not traditionally part of an equipment violation traffic stop. But as part of the "war" on drugs, police officers have been encouraged to include such questions and requests as a routine component of traffic stops. As Professor LaFave explains,

> In recent years[,] more Fourth Amendment battles have been fought about police activities incident to [investigative stops] for a traffic infraction, what courts call a "routine traffic stop," than in any other context. There is a reason why this is so, and it is *not* that police have taken an intense interest in such matters as burned-out taillights and unsignaled lane changes per se. Rather, the renewed interest of the police in traffic enforcement is attributable to a federally-sponsored initiative related to the "war on drugs."

*LaFave*, § 9.3, Vol. 4, pp. 358–59 (emphasis in the original) (footnotes omitted).

Professor LaFave's observation is confirmed by the testimony in the present case. Trooper Salinas testified that, every night he was on traffic patrol, he would randomly ask motorists if they were carrying weapons or drugs, and if they would consent to a search.

Cases from other states show that this police practice is not an isolated phenomenon. *See State v. Ready*, 252 Neb. 816, 565 N.W.2d 728, 731 (1997) (an officer testified that he "routinely" asked for a consent to search when he made a traffic stop); *United States v. Lattimore*, 87 F.3d 647, 649 (4th Cir.1996) (an officer stated that he requests and obtains permission to search "97 percent of the cars [he] stop[s]"); *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498, 502–03 (1994) (an officer testified that he requested to search 786 vehicles involved in traffic stops in a single year; the Ohio court, extrapolating from this officer's testimony, expressed concern over the "staggering" numbers of Ohio citizens who must be affected by this police practice.)

As *LaFave* summarizes, "[c]onsent searches are no longer an occasional event" in which people who are actively suspected of a crime may advise the police of their willingness to submit to a search. Instead, consent searches "are now a wholesale activity accompanying a great many traffic stops". *LaFave*, § 9.3(e), Vol. 4, p. 397.

These searches result in a substantial interruption of motorists' travels. Because drugs are easily concealed in crevices, behind paneling, and under seats and carpeting, a search for drugs can be a painstaking business. Motorists often "wait by the roadside [while] their vehicles are ransacked"—a process that typically takes twenty to forty minutes. *Id.* at p. 397 & n. 214.

In all but exceptional cases, these consent searches are held to be valid under the Fourth Amendment. The federal law in this area is premised on the assumption that, all things being equal, a motorist who does not wish to be subjected to a search will refuse consent when the officer seeks permission to conduct a search. But experience has shown that this assumption is wrong.

Studies reveal that the vast majority of motorists who are subjected to this type of request will accede to the officer and allow the search. As Professor LaFave notes, "[G]uilty or innocent, most motorists [who are] stopped and asked by [the] police for consent to search their vehicles will expressly give permission to search". *Id.* at p. 395.

One study showed that consent was given 90 percent of the time. *See* Illya D. Lichtenberg, *Voluntary Consent or Obedience to Authority: An Inquiry Into the "Consensual" Police–Citizen Encounter* (1999), cited in *LaFave*, § 9.3(e), Vol. 4, p. 395, n. 200.[10] In *State v. Carty*, 170 N.J. 632, 790 A.2d 903, 910–11 (2002), the New Jersey Supreme Court cited empirical studies showing that 95 percent of motorists consented to searches— and that 80 percent of these motorists were innocent of any wrongdoing (other than the traffic infraction that led to the stop).

The result is that "thousands upon thousands of motor vehicle searches of innocent travelers [are conducted] each year". *La-Fave*, § 9.3(e), Vol. 4, p. 395 & n. 201, citing Robert H. Whorf, *Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique*, 28 Ohio Northern Univ. L.Rev. 1, 2 (2001). As the Ohio Court of Appeals noted in *Retherford*, 639 N.E.2d at 503, these motorists "are being routinely delayed in their travels and asked to relinquish . . . their right to privacy in their automobiles and luggage[.]"

How are we to explain the willingness of thousands of motorists to agree to searches of their persons and their vehicles at the request of a police officer? One explanation was offered by Justice Stevens in his dissenting opinion in *Robinette*:

> Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away [while] the officer continues to address him.

519 U.S. at 47, 117 S.Ct. at 425 (quoting the Ohio Supreme Court in *State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695, 698 (1995)).

This helps to explain the seemingly inexplicable behavior of those motorists who agree to a search of their persons or their vehicles when they know that they are carrying drugs. But it also helps to explain why innocent motorists—who comprise the great majority of those searched—also agree to have their persons and/or their vehicles searched, even though this will entail a delay of twenty to forty minutes. As Justice Stevens noted in his dissent,

> [I]t is fair to presume that most drivers who have been stopped for [a traffic infraction] are in a hurry to get to their destinations; such drivers have no interest in prolonging the delay occasioned by the

---

10. Lichtenberg's work is an unpublished Ph.D. dissertation on file with Rutgers University. This dissertation is described in Steven L. Chanenson,

*Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches,* 71 Tenn. L.Rev. 399, 451, 455 (2004).

stop just to engage in idle conversation with an officer, much less to allow a potentially lengthy search. I also assume that motorists—even those who are not carrying contraband—have an interest in preserving the privacy of their vehicles and possessions from the prying eyes of a curious stranger. The fact that [the] officer [in a companion case] successfully used [this] method of obtaining consent to search roughly 786 [vehicles] in one year, *State v. Retherford*, ... 639 N.E.2d 498, 502 ( [Ohio App.] 1994), indicates that motorists generally respond in a manner that is contrary to their self-interest. Repeated decisions by ordinary citizens to surrender that interest cannot satisfactorily be explained on any hypothesis other than an assumption that they believed they had a legal duty to do so.

*Robinette*, 519 U.S. at 47–48, 117 S.Ct. at 425 (footnote omitted).

A second reason why motorists might agree to be searched is that, even when motorists know their constitutional rights, they still have a strong interest in catering to the officer's wishes until the officer announces their decision whether to issue a citation or only a warning. As the New Jersey Supreme Court noted in *Carty*, 790 A.2d at 908, it is "virtually impossible" to drive a motor vehicle in this country and not unwittingly commit some infraction of the motor vehicle laws. Thus, a substantial number of drivers are at risk of being pulled over—and, during these traffic stops, being asked to allow police officers to search their persons or their vehicles. In these circumstances, motorists may decide to sacrifice their right to privacy and grant consent to the requested searches in order to escape with only a warning.

This type of psychological pressure would only be accentuated in situations like Brown's case. Brown was never informed of the reason why Trooper Salinas pulled her over. In other words, Brown was never told that she was the subject of a routine traffic stop (rather than the target of a more serious criminal investigation). For all that Brown knew, Salinas requested her license so that he could verify her identity before making a full custodial arrest. Moreover, because Salinas never apprised Brown of the reason for the stop, Brown had no idea when, or if, she would be free to leave.

Whatever the exact reasons for motorists' willingness to accede to the requests of law enforcement officers, it is clear that large numbers of motorists are consenting to be searched each year—indeed, each month, and each week. Motorists are giving consent in such large numbers that it is no longer reasonable to believe that they are making the kind of independent decision that lawyers and judges typically have in mind when they use the phrase "consent search".

On November 23, 1880, at Harvard Law School, future Supreme Court Justice Oliver Wendell Holmes Jr. delivered a lecture in which he proclaimed:

> The life of the law has not been logic; it has been experience. The felt necessities of the time ... have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics.

(Later published as *The Common Law*, Lecture I, "Early Forms of Liability", first paragraph.) [11]

Holmes's observation rings most true at those times when it becomes obvious that legal rules developed in former years, and in former circumstances, no longer strike their intended balance of competing interests. This is one of those times.

The traffic stop was intended to be a seizure of limited duration and scope for a limited purpose. Instead, because most people need to travel by car, and because of the near-inevitability that people will commit traffic infractions, the "routine" traffic stop has become the doorway to widespread and

---

11. Available at http://www.law.harvard.edu/ library/collections/special/online-collections/     common_law/index.php)

probing searches of persons, vehicles, and luggage.

The Fourth Amendment, as interpreted by the United States Supreme Court, and as applied by various federal circuit courts and state courts, offers little protection to motorists in this situation. Indeed, legal commentators have been widely critical of the United States Supreme Court's consent-search jurisprudence.

See, e.g., Daniel R. Williams, *Misplaced Angst: Another Look At Consent–Search Jurisprudence*, 82 Ind. L. Jrnl. 69, 69–71 (2007) ("No one seems to have a good word to say about consent-search jurisprudence"; it is a "problematic realm of Fourth Amendment law."); Note, *The Fourth Amendment and Antidilution: Confronting the Overlooked Function of the Consent Search Doctrine*, 119 Harv. L.Rev. 2187, 2188 (2006) ("Most commentators agree that the Court's current approach is flawed, and even those commentators who defend the Court's holdings criticize its reasoning."); Ric Simmons, *Not "Voluntary" But Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine*, 80 Ind. L. Jrnl. 773, 773 (2005) (consent-search paradigm is a "triple inconsistency: the Court claims to be applying one test, but in reality is applying a different test—and neither test fully comports with the real-life confrontations"); Erica Flores, Comment, *People, Not Places: The Fiction of Consent, The Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops*, 7 U. Pa. Jrnl. Const. L. 1071, 1095 (2005) (because "[t]here is no such thing as a consensual encounter during a traffic stop", the author argues that "courts need a new standard"); Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L.Rev. 1843, 1898 (2004) (arguing that, under federal precedent, officers can "obviate any and all time and scope limitations" by performing "the well-known Lt. Columbo gambit [of asking 'one more thing . . .']", with the courts adjudging any ensuing consent to search to be voluntary despite the reality that "any person who has been detained for a traffic violation is unlikely to so perceive the situation"); David A. Harris, *Car Wars: The Fourth Amendment's Death on the Highway*, 66 Geo. Wash. L.Rev. 556 (1998); Ian D. Midgley, Comment, *Just One Question Before We Get To Ohio v. Robinette: "Are You Carrying Any Contraband . . . Weapons, Drugs, Constitutional Protections . . . Anything Like That?"* 48 Case Western Res. L.Rev. 173 (1997); Steven L. Chanenson, *Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches*, 71 Tenn. L.Rev. 399, 402 (2004) ("[A]lthough scholars have criticized the consent search doctrine for years, the Supreme Court has steadfastly defended it and sided with a pro-law enforcement approach."); Robert H. Whorf, *Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique*, 28 Ohio Northern U.L.Rev. 1, 7 (2001) (the "coercion inherent" in consent searches after routine traffic stops "must be addressed in some way").

To remedy this problem, some state courts have begun to apply the Fourth Amendment in a stricter fashion—abandoning a primary emphasis on the temporal duration of the stop, and acknowledging that, even though the act of asking a question may not be a "seizure" in the traditional sense, some questions and requests can alter the fundamental nature of the interaction between officer and motorist.

For instance, the court in *Charity v. State*, 132 Md.App. 598, 753 A.2d 556 (2000), held that even when the total length of a traffic stop does not exceed the amount of time that would normally be required, "the purpose of the justifying traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been completed or has run a substantial course." *Id.* at 565. The Maryland court declared that an officer's authority to stop a vehicle for an observed violation of the traffic laws "does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth

Amendment rights." *Id.* at 572.[12] *Accord, Caldwell v. State,* 780 A.2d 1037, 1048 (Del. 2001) ("the legitimating *raison d'etre* of [a traffic] stop may evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation" to pursue a drug investigation).

However, many state courts have abandoned any reliance on the Fourth Amendment and have looked instead to their own state law to provide greater restrictions on police activity during traffic stops.

Some state courts have interpreted their state constitutions to flatly forbid the police from posing any question or request that is unrelated to the underlying reason(s) for the traffic stop, unless the question or request is supported by particularized reasonable suspicion to believe that the motorist has committed or is committing some other crime. *See State v. Washington,* 875 N.E.2d 278, 282–83 (Ind.App.2007); *State v. Fort,* 660 N.W.2d 415, 418–19 (Minn.2003), and *State v. Wiegand,* 645 N.W.2d 125, 135 (Minn.2002); *State v. Elders,* 192 N.J. 224, 927 A.2d 1250, 1260–61 (2007), and *State v. Carty,* 170 N.J. 632, 790 A.2d 903, 912 (2002); *State v. McClendon,* 350 N.C. 630, 517 S.E.2d 128, 132 (1999), and *State v. Parker,* 183 N.C.App. 1, 644 S.E.2d 235, 241–42 (2007). *See also State v. Quino,* 74 Haw. 161, 840 P.2d 358, 363–64 (1992) (applying a similar rule to a non-motor vehicle investigative stop).

Another state has interpreted its constitution to allow officers to engage in some degree of unrelated questioning, even in the absence of articulable suspicion, but not if the officer's questions or requests "change[ ] the fundamental nature of the stop". *State v. McKinnon-Andrews,* 151 N.H. 19, 846 A.2d 1198, 1203 (2004).

And New York has imposed a similar requirement as a matter of state common law. *See People v. Hollman,* 79 N.Y.2d 181, 581 N.Y.S.2d 619, 590 N.E.2d 204 (1992) (holding that reasonable suspicion was required before narcotics officers could approach a passenger in a bus terminal and ask for permission to search the person's bag).

The Alaska Supreme Court has long recognized that the search and seizure provision of our state constitution (Article I, Section 14) "contains an even broader guarantee against unreasonable searches and seizures than is found in its federal counterpart." *Woods & Rohde, Inc. v. Alaska Dept. of Labor,* 565 P.2d 138, 150–51 (Alaska 1977). As the supreme court explained in *Woods & Rohde,* this broader interpretation of our state constitution is based on the wording of Article I, Section 14 (which differs from the Fourth Amendment in that it includes the additional phrase "and other property"), and also on the fact that the citizens of Alaska have amended our constitution to include an express guarantee of privacy (Article I, Section 22). *Id.; see also Anchorage Police Department Employees Ass'n v. Municipality of Anchorage,* 24 P.3d 547, 550 (Alaska 2001).

Both the Alaska Supreme Court and this Court have repeatedly interpreted Article I, Section 14 to provide greater protection to the citizens of this State than they would otherwise have under the Fourth Amendment.[13] We have exercised this authority when we were convinced that the United States Supreme Court's interpretation of the Fourth Amendment "fails to adequately safeguard our citizens' right to privacy, ... fails to adequately protect citizens from unwarranted government intrusion, and ... unjustifiably reduces the incentive of police officers to honor citizens' constitutional rights." *Joseph v. State,* 145 P.3d 595, 605 (Alaska App. 2006).

■ The facts of this case present an example of an apparently ongoing and unjusti-

---

12. Quoting *Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115, 1120 (1997).

13. *Anchorage Police Department Employees Ass'n,* 24 P.3d at 550; *State v. Malkin,* 722 P.2d 943, 949 (Alaska 1986) (Compton, J., dissenting); *State v. Jones,* 706 P.2d 317, 324 (Alaska 1985); *State v. Daniel,* 589 P.2d 408, 416 (Alaska 1979); *State v. Glass,* 583 P.2d 872, 878–79 (Alaska 1978); *Roman v. State,* 570 P.2d 1235, 1240 (Alaska 1977); *Zehrung v. State,* 569 P.2d 189, 199 (Alaska 1977), *modified on rehrg.,* 573 P.2d 858 (Alaska 1978); *Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976); *Daygee v. State,* 514 P.2d 1159, 1165 (Alaska 1973); *Joseph v. State,* 145 P.3d 595, 605 (Alaska App.2006); *State v. Crocker,* 97 P.3d 93, 94 (Alaska App.2004); *Jackson v. State,* 791 P.2d 1023, 1026 (Alaska App.1990).

fied infringement of the privacy rights of Alaska citizens. And, as we have explained here, it is uncertain whether the Fourth Amendment to the United States Constitution offers any remedy. We therefore conclude that Article I, Section 14 of the Alaska Constitution must be interpreted to grant broader protections than its federal counterpart in situations like this.

To resolve Brown's case, we need not decide whether Article I, Section 14 should be interpreted to completely preclude requests for searches during a routine traffic stop unless the search is related to the ground for the stop or is otherwise supported by a reasonable suspicion of criminality. We leave that question for another day. Because Brown's case presents a particularly egregious example of this police practice, our holding in Brown's case can be more narrow.

Brown's case does, indeed, involve a request for a search during a traffic stop where the requested search was unrelated to the ground for the stop, and where the requested search was not supported by any other reasonable suspicion of criminality. But Brown's case involves additional facts that distinguish it from the run-of-the-mill traffic stop.

Brown was stopped for an equipment violation, but she was never informed of the reason for the stop. Brown did not know if she was suspected of a minor traffic infraction or a more serious crime. Without explanation, the trooper demanded Brown's driver's license, and then he went back to his patrol vehicle. For all that Brown knew, the trooper might be verifying her identity in preparation for arresting her.

When the trooper returned to Brown's car, he still refrained from telling Brown the reason for the stop. Moreover, even though the trooper had decided to let Brown off with a warning, the trooper gave Brown no indication that she was free to go (or would shortly be free to go). Instead, the trooper asked Brown to consent to a search of her person and her vehicle for drugs.

Because Brown remained ignorant of the reason for the stop, she did not know the basis for the trooper's assertion of authority over her. Consequently, even if Brown had been fully conversant with search and seizure law, Brown had no way of knowing if she had the right to refuse the trooper's request—no way of knowing if the trooper's request to conduct a search was indeed a request or was, instead, simply a polite phrasing of a command.

Given these circumstances, the fact that the trooper's request was made within two and a half minutes of the stop (in other words, within the amount of time that a motorist would normally expect to be detained for a routine traffic stop) is not sufficient to establish the legality of the trooper's request. Under the facts of this case, we hold that Article I, Section 14 of the Alaska Constitution prohibited Trooper Salinas from asking Brown for permission to search her person and her vehicle for drugs.

The judgement of the superior court is therefore REVERSED.

COATS, Chief Judge, concurring.

In order to prove voluntary consent, "[t]here must be clear and convincing evidence that the consent was unequivocal, specific, and intelligently given." [1] In the present case, as the majority opinion points out, Brown was stopped at 3 a.m. for an equipment violation—because her car's rear license plate was not properly illuminated. Brown's car and the trooper's car were the only cars on the road. The trooper never informed Brown why he stopped her, and he took and retained Brown's driver's license. As the majority opinion states:

When the trooper returned to Brown's car, he still refrained from telling Brown the reason for the stop. Moreover, even though the trooper had decided to let Brown off with a warning, the trooper gave Brown no indication that she was free to go (or would shortly be free to go). Instead, the trooper asked Brown to consent

**1.** *Gieffels v. State,* 590 P.2d 55, 62 (Alaska 1979) (citing *Sleziak v. State,* 454 P.2d 252, 257 (Alaska 1969)).

to a search of her person and her vehicle for drugs.

Because Brown remained ignorant of the reason for the stop, she did not know the basis for the trooper's assertion of authority over her. Consequently, even if Brown had been fully conversant with search and seizure law, Brown had no way of knowing if she had the right to refuse the trooper's request—no way of knowing if the trooper's request to conduct a search was indeed a request or was, instead, simply a polite phrasing of a command.

Under these circumstances I would hold that the State did not show by clear and convincing evidence that Brown's consent was "unequivocal, specific, and intelligently given." Although I (like my colleagues) rely on article, 1 section 14 of the Alaska Constitution to conclude that the evidence in this case must be suppressed, I reach this decision by a slightly different route than my colleagues have taken.