NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

PHILLIP ALEXANDER DUTY,

                Appellant,

        v.

STATE OF ALASKA,

                Appellee.

Court of Appeals No. A-13041
Trial Court No. 4FA-17-01203 CR

O P I N I O N

No. 2750 — June 23, 2023

Appeal from the District Court, Fourth Judicial District, Fairbanks, Ben A. Seekins, Judge.

Appearances: Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Jessica R. Haines, Assistant District Attorney, Fairbanks (initial brief), Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage (supplemental brief), and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

Following a jury trial, Phillip Alexander Duty was convicted of fourth-degree misconduct involving a controlled substance for possessing a vial of testosterone.[1] A trooper discovered the testosterone after conducting a traffic stop of Duty for an equipment violation. During the stop, the trooper asked Duty if there were any drugs in the vehicle. Duty responded that he did not have any drugs in the vehicle. He then volunteered that the trooper could search his vehicle, which led to the discovery of the testosterone.

Duty moved to suppress evidence of the testosterone. Duty argued that the trooper was precluded from asking him whether there were drugs in his vehicle, and that these impermissible questions invalidated his subsequent consent to search. More specifically, Duty argued that the trooper was required to possess reasonable suspicion of imminent public danger or recent serious harm to persons or property before asking about potential crimes unrelated to the underlying reason for the stop. The district court denied Duty's motion. Duty renews his claim on appeal.

For the reasons explained in this opinion, we conclude that the trooper was permitted to ask Duty if there were drugs in his vehicle as long as the trooper possessed reasonable suspicion of criminality. We further conclude that the trooper did, in fact, possess reasonable suspicion of criminality. We therefore affirm the district court's denial of Duty's motion to suppress.

*Underlying facts*

This case arose after Alaska State Trooper Trevor Howard stopped Duty because the car he was driving was missing a front license plate and had a tail light that was partially out. Trooper Howard approached the vehicle, and asked Duty, who was

---

[1]    Former AS 11.71.050(a)(4) (June 4, 2017) & AS 11.71.180(f)(26).

driving the vehicle, for his license and vehicle registration. Howard did not inform Duty of the basis for the traffic stop.

When Duty opened the glove compartment to retrieve the vehicle registration, Howard saw a piece of tin foil, measuring approximately two inches by two inches, in the glove compartment. Howard testified that, based on his experience, the foil looked like a "bindle" (a folded piece of paper or foil used to transport drugs). Howard asked Duty if he could look at the bindle, and Duty agreed. Howard examined the bindle and found that it was neither burnt nor contained any narcotics. Howard later testified that there were other "torn up . . . pieces of tin foil" in the vehicle, but he provided no further details about this observation. Howard also testified that he had prior contacts with Duty in which Duty had either burnt tin foil in his vehicle or "tooter straws" in his pocket.[2]

Duty informed Howard that the vehicle belonged to his girlfriend, which prompted Howard to ask a few questions about how long Duty and his girlfriend had been dating. The following exchange then occurred, approximately two minutes after Howard made initial contact with Duty:

> *Trooper*: Okay. Anything illegal in the car, man, you know about?
>
> *Duty*: No.
>
> *Trooper*: Are you sure?
>
> *Duty*: Yeah.
>
> *Trooper*: Okay. Anything in here that's yours?
>
> *Duty*: My jacket.
>
> *Trooper*: Your jacket. Okay. You don't have any drugs in here, man, do you?

---

[2]  Howard testified that "tooter straws" are a method for inhaling powder narcotics.

*Duty*: Oh no.

*Trooper*: Okay.

*Duty*: You can take a look.

*Trooper*: Can I?

*Duty*: Yeah.

Trooper Howard asked Duty to step out of the vehicle. Duty then asked Howard, "What did I do?" In response, Howard told Duty that the vehicle was missing a front license plate. During the subsequent search of the vehicle, Howard discovered a vial of testosterone.

Duty filed a motion to suppress evidence of the testosterone. Duty argued that the trooper lacked a sufficient basis for questioning Duty about whether there was anything illegal in the vehicle, including drugs. Duty further argued that his consent to search the vehicle was invalid in light of this impermissible questioning and the trooper's failure to inform Duty of the reason for the traffic stop.

The district court denied Duty's motion to suppress. The court ruled that, based on the officer's observations and past experiences with Duty, the officer had reasonable suspicion of drug possession and thus, a sufficient basis for questioning Duty about the presence of drugs and requesting permission to search the vehicle.[3] The court further concluded that Duty's consent to search the vehicle was voluntary and valid, noting that Duty himself had offered to allow the officer to search the vehicle.

---

[3] We note that, at the start of trial, the district court provided an alternative basis for denying Duty's motion to suppress — that the trooper actually had *probable cause* to believe that Duty possessed drugs, based on the trooper's discovery of the foil "bindle" and his prior contacts with Duty, thereby justifying the trooper's questioning. Neither party has discussed this ruling, and we decline to address it in the absence of adversarial briefing. But arguably, the court's later ruling is an alternative ground for affirming Duty's conviction.

A jury subsequently convicted Duty of fourth-degree misconduct involving a controlled substance for possessing the vial of testosterone.[4]  On appeal, Duty challenges the court's denial of his motion to suppress.

*Why we conclude that the trooper had reasonable suspicion to ask Duty about the presence of drugs in his vehicle*

On appeal, Duty argues that the trooper was not permitted to ask him about the presence of drugs in his vehicle, and that those questions invalidated Duty's subsequent consent to search by impermissibly expanding the scope of the stop.  The central legal question presented by this appeal is what level of suspicion was required for the trooper to ask Duty whether he had "anything illegal in the car" or "any drugs in here."  The State argues that the trooper needed only a reasonable suspicion of criminality to deviate from the original focus of the stop.  Duty argues that the trooper was instead required to possess reasonable suspicion of imminent public danger or recent serious harm.

The seminal Alaska case on the question of whether a police officer may ask questions about potential crimes unrelated to the basis for the stop is *Brown v. State*.[5]  Brown was stopped for an equipment violation, but she was never informed of the reason for the stop.  The trooper took Brown's license back to his patrol car and confirmed that it was valid and that there were no outstanding warrants for her arrest; the trooper then decided to issue Brown a warning.  But rather than explaining the reason for the stop and issuing a warning to Brown, the trooper instead asked for permission to search Brown's

---

[4]    Former AS 11.71.050(a)(4) (June 4, 2017) & AS 11.71.180(f)(26).

[5]    *Brown v. State*, 182 P.3d 624 (Alaska App. 2008).

vehicle for weapons and drugs. Brown acquiesced, and the trooper found a crack cocaine pipe in Brown's coat.[6]

On appeal, Brown argued that her encounter with the trooper was implicitly coercive, and that her consent to search was therefore invalid. We agreed, and we reversed the superior court's denial of Brown's motion to suppress.[7]

As we discussed at length in *Brown*, many courts, including the federal courts, have concluded "that the mere asking of questions — even a question such as, 'May I search you and your vehicle for drugs?' — does not alter the duration or scope of the intrusion upon a motorist's freedom and privacy that normally accompanies a traffic stop."[8] These courts have concluded:

> [E]ven when there is no reason to suspect that the motorist is carrying drugs, it is nevertheless proper for the officer to question the motorist about drugs, and to request the motorist's permission to conduct a drug search, so long as the officer's questioning does not extend the duration of the traffic stop beyond what would normally be required to investigate and respond to the observed traffic infraction.[9]

These cases are premised on the assumption that "a motorist who does not wish to be subjected to a search will refuse consent when the officer seeks permission to conduct a search."[10]

---

[6] *Id.* at 624-25.

[7] *Id.* at 634.

[8] *Id.* at 625.

[9] *Id.*

[10] *Id.* at 630.

But we questioned the validity of this assumption and ultimately rejected the approach taken by the federal courts, explaining that "the Alaska Constitution imposes greater restrictions on a police officer's authority to request a motorist's permission to conduct a search during a routine traffic stop."[11] We cited empirical studies showing that motorists consent to vehicle searches more than ninety percent of the time.[12] We noted that this high rate of consent was inconsistent with the assumption that a motorist will generally feel free to refuse consent: guilty drivers have no reason to voluntarily consent to a search that will reveal their criminal activities, and innocent drivers have no reason to consent to a search that will result in a substantial delay of their travel. Quoting Justice Stevens, we stated that "[r]epeated decisions by ordinary citizens to surrender [their self-interest] cannot satisfactorily be explained on any hypothesis other than an assumption that they believed they had a legal duty to do so."[13]

With this background in mind, we concluded that "an officer's questions about other potential crimes, and an officer's requests for permission to conduct a search,

---

[11] *Id.* at 626. We also noted that legal commentators had been widely critical of the United States Supreme Court's consent-search jurisprudence, and we stated that "[t]he Fourth Amendment, as interpreted by the United States Supreme Court, and as applied by various federal circuit courts and state courts, offers little protection to motorists in this situation." *Id.* at 632.

[12] *Id.* at 630 (citing Illya D. Lichtenberg, *Voluntary Consent or Obedience to Authority: An Inquiry Into the "Consensual" Police-Citizen Encounter* (1999) (Ph.D. dissertation, Rutgers University) (study showing that consent was given ninety percent of the time when officers requested to search a vehicle); *State v. Carty*, 790 A.2d 903, 910-11 (N.J. 2002) (citing empirical studies showing that ninety-five percent of motorists consented to searches); 4 Wayne R. LaFave, *Search and Seizure* § 9.3(e), at 395 nn. 200-201 (4th ed. 2004)).

[13] *Id.* at 631 (quoting *Ohio v. Robinette*, 519 U.S. 33, 48 (1996) (Stevens, J., dissenting)).

are significant events under the search and seizure provision of the Alaska Constitution, Article I, Section 14."[14]

The principles and policy arguments articulated in *Brown*, as well as the numerous scholarly sources we cited, clearly support the notion that an officer cannot ask questions about other potential crimes, or ask for permission to search, unless the officer's questions are related to the basis for the stop or otherwise supported by a reasonable suspicion of criminality.

But our actual holding in *Brown* was narrow: we held that "*under the circumstances presented in [Brown's] case*, the officer conducting the traffic stop was prohibited from requesting Brown's permission to conduct a search that was (1) unrelated to the basis for the stop and (2) not otherwise supported by a reasonable suspicion of criminality."[15] More specifically, we noted that the trooper had never informed Brown of the reason for the stop or given her any indication that she was free to go, even though the trooper had already decided to let her off with a warning. We explained that because Brown "remained ignorant of the reason for the stop, she did not know the basis for the trooper's assertion of authority over her," and therefore "even if Brown had been fully conversant with search and seizure law, Brown had no way of knowing if she had the right to refuse the trooper's request[.]"[16] We therefore concluded that "[b]ecause Brown's case presents a particularly egregious example of this police practice, our holding in Brown's case can be more narrow."[17]

---

[14] *Id.* at 626.

[15] *Id.* (emphasis added).

[16] *Id.* at 634.

[17] *Id.*

*Brown*'s narrow holding is consistent with the duty of courts to decide only those cases presented to them, and to avoid enunciating broad principles of law when doing so is not necessary to the case at bar. But this approach can also lead to confusion. Because of our narrow holding in *Brown*, subsequent cases have declined to cite it for the broader proposition its reasoning supports.[18] It is therefore unclear whether, in Alaska, an officer needs reasonable suspicion of criminality before asking whether there is contraband in a vehicle.

But the reasoning of *Brown* is persuasive, and we therefore adopt as the general rule that an officer conducting a traffic stop cannot ask questions about other potential crimes, or ask for permission to search, unless the officer's questions are either related to the basis for the stop or otherwise supported by a reasonable suspicion of criminality. This general rule will no doubt be refined through its continued application to specific facts, and over time, we will have opportunities for additional clarification. What matters, for present purposes, is that it is understood as the starting point for our analysis, not as a narrow exception that only applies in cases of particularly egregious police conduct.

Applying that general rule to Duty's case, we conclude that the trooper possessed reasonable suspicion of criminality when he asked Duty about the presence of drugs in his vehicle. When Duty opened his glove compartment, the trooper could see a small piece of foil. The trooper testified that, based on his experience, the foil looked like a bindle used to transport drugs. The trooper also testified that he observed other

---

[18] *See, e.g.*, *Murphy v. Anchorage*, 2010 WL 986688, at *4 (Alaska App. Mar. 17, 2010) (unpublished); *Bostwick v. State*, 2010 WL 668947, at *2-3 (Alaska App. Feb. 24, 2010) (unpublished); *Rogers v. State*, 2020 WL 9174652, at *1 (Alaska App. Oct. 7, 2020) (unpublished summary disposition); *see also State v. Jenkins*, 3 A.3d 806, 849-50 (Conn. 2010) (concluding that *Brown*'s narrow holding creates an "internal inconsistency in the opinion" and "necessarily diminishes the persuasive value of the case").

pieces of foil in the car, and that he had previous interactions with Duty involving drug paraphernalia. This information was sufficient to establish reasonable suspicion to ask Duty if there were drugs in his vehicle.[19]

Duty points out that the trooper examined the bindle and found that it was neither burnt nor contained any narcotics. He argues that any suspicion that may have existed was therefore dispelled and the trooper could not ask any additional questions. We disagree. The presence of the bindle and other foil in the car, combined with the officer's previous interactions with Duty, was sufficient to establish the reasonable suspicion necessary to ask the minimally intrusive questions posed by the trooper.[20]

---

[19] *Cf. McGuire v. State*, 70 P.3d 1114, 1116 (Alaska App. 2003) (concluding that an officer's pat-down of the defendant for weapons, during which the officer felt the outline of a rectangular object that the officer suspected was a bindle, gave the officer "at least an articulable suspicion" that the defendant possessed illegal drugs; thus, the officer was permitted to ask the defendant what was in his pocket); *Schraff v. State*, 544 P.2d 834, 847 (Alaska 1975) (upholding the seizure and ensuing search of an aluminum foil "slip" partly because of the officer's "experience and unequivocal testimony regarding his recognition of the contraband nature of the foil packet"); *see also Duncan v. State*, 178 P.3d 467, 470-71 (Alaska App. 2008) (holding that, while "an unexplained claim of a suspect's criminal reputation should not be credited when evaluating probable cause," the officers' personal knowledge of the defendant from prior contacts — which involved suspicions of drug sales — could properly be considered when determining whether probable cause existed to arrest the defendant for selling drugs).

[20] On appeal, Duty does not challenge the district court's reliance on the officer's previous interactions with Duty to establish reasonable suspicion of criminality. Although we need not directly address this issue, we note that the district court's reliance on the previous interactions appears broadly consistent with how our Court and other courts have approached this issue. *See Duncan*, 178 P.3d at 471; 2 Wayne R. LaFave, *Search and Seizure* § 3.2(d), at 89 & nn.196-98 (6th ed. 2020) (collecting cases discussing this issue, and explaining that law enforcement officers may generally consider specific prior interactions if they are relevant to the crime being investigated).

But this analysis is insufficient to resolve Duty's appeal, because Duty argues that the trooper needed reasonable suspicion not merely of criminality, but of *imminent public danger* or *recent serious harm* before he could ask about the presence of drugs in the vehicle. We now address that argument.

*Why we conclude that it was not necessary for the trooper to possess reasonable suspicion of imminent public danger or recent serious harm before asking Duty about the presence of drugs in the vehicle*

In *Terry v. Ohio*, the United States Supreme Court held that a law enforcement officer may initiate an investigative stop based on "reasonable suspicion" of criminal activity — *i.e.*, "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[21] Alaska applies a higher test for initiating a valid investigative stop. Under the Alaska Supreme Court's decision in *Coleman v. State*, the police must possess "reasonable suspicion that imminent public danger exists or [that] serious harm to persons or property has recently occurred" in order to conduct an investigative stop.[22]

Duty argues that just as the heightened *Coleman* standard governs whether an officer may *initiate* an investigative stop, the same heightened standard should govern whether an officer can ask questions that *expand the scope* of a traffic stop. In other words, Duty argues that the "reasonable suspicion of criminality" we discussed in *Brown* should be viewed as incorporating the *Coleman* test.

This question matters in this case because we have previously held that suspicion that a person possesses an illegal drug for personal use does *not* satisfy the *Coleman* test — *i.e.*, does not establish reasonable suspicion of imminent public danger

---

[21] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

[22] *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976).

or recent serious harm. In *Pooley v. State*, we upheld an investigative stop under *Coleman* because we concluded that the facts known to the officers provided reasonable suspicion that Pooley had just transported "substantial quantities of illegal drugs a long distance for commercial purposes" — thus, constituting an imminent danger to public safety.[23] However, we distinguished the facts presented in *Pooley* from a situation in which the police stop a person because they suspect that the person possesses only a small quantity of an illegal drug for personal use.[24] We noted that the latter situation "rais[ed] the spectre" of stop-and-frisk procedures being misused and becoming "a vehicle 'for serious and unintended erosion of the protection of the Fourth Amendment.'"[25]

Thus, in *Joseph v. State*, we held that an investigative stop of a man who the officer suspected had just been publicly smoking marijuana was not justified because "the public use of marijuana is not an 'imminent public danger' for purposes of the *Coleman* rule."[26] Likewise, in *Skjervem v. State*, we held that a police officer's observation of a canister in the defendant's vehicle that the officer suspected contained a personal use amount of drugs did not provide a basis for continuing to detain the defendant after the suspicions that led to the initial investigative stop appeared to have

---

[23]  *Pooley v. State*, 705 P.2d 1293, 1307 (Alaska App. 1985).

[24]  *Id.* at 1307 n.9.

[25]  *Id.* (second quote from *Mattern v. State*, 500 P.2d 228, 233 n.15 (Alaska 1972), which in turn quotes *Adams v. Williams*, 407 U.S. 143, 153 (1972) (Brennan, J., dissenting)).

[26]  *Joseph v. State*, 145 P.3d 595, 598 (Alaska App. 2006). We also noted that because any use of marijuana occurred outside the presence of the officer, the officer did not have probable cause to arrest Joseph. *Id.* at 600-01.

been resolved.[27]  In other words, the police could not initiate a new investigative stop based on suspected personal drug use alone.

In this case, Duty asks us to hold that the limited expansion of the *scope* of the stop at issue here (*i.e.*, questions about whether Duty had anything illegal in the vehicle) must be supported by the same level of suspicion needed to initiate an investigative stop — suspicion of imminent public danger or recent serious harm — even when the questions do not meaningfully extend the duration of the stop.[28]

---

[27]  *Skjervem v. State*, 215 P.3d 1101, 1106-07 (Alaska App. 2009) (*Skjervem I*).  In *Skjervem*, the police took the defendant into custody after suspecting he was involved in a burglary.  Although the evidence suggested that the officers quickly learned that no burglary had occurred, the police did not immediately release the defendant; rather, the police kept him in handcuffs and questioned him about the small canister in his car that they believed was used to store small quantities of drugs.  The defendant told the police that the canister contained marijuana and consented to a search of his vehicle.  We remanded *Skjervem* to the superior court to determine when the police discovered there had been no burglary.  This was relevant because "[i]f the police continued to hold Skjervem in custody after the burglary investigation was resolved, and if their only justification for this continued detention was the observation of the small, gold-colored canister, then the continued detention of Skjervem was illegal[.]"  *Id.* at 1103-04, 1111.

[28]  We note that Duty briefly argues on appeal that his detention was longer than necessary to accomplish the original purpose of the stop.  This claim is raised cursorily and was not ruled on by the district court.  It is therefore waived.  *See Hagen v. Strobel*, 353 P.3d 799, 805 (Alaska 2015) ("Where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (citation omitted)); *Hollstein v. State*, 175 P.3d 1288, 1290 (Alaska App. 2008) (stating that to preserve an issue for appeal, a litigant must both raise an issue and obtain a ruling on that issue).

In any event, as best we can tell, Duty is claiming that the *search*, rather than the officer's questions about the presence of contraband, unreasonably extended the duration of the stop.  As we discuss later in this opinion, however, the search was based on Duty's voluntary consent, and Duty has failed to explain how an extension of a stop to conduct a valid consent search would be unreasonable under either the Fourth Amendment of the United States Constitution or Article I, Section 14 of the Alaska Constitution.

We decline Duty's request to extend *Coleman* in this manner. The primary purpose of *Coleman*'s heightened test is to prevent pretextual stops.[29] As we noted in *G.B. v. State*, the *Coleman* rule derives from Justice Brennan's dissent in *Adams v. Williams*.[30] In *Adams*, Justice Brennan — adopting Judge Friendly's dissent in the Second Circuit's initial decision in the same case — expressed "the gravest hesitancy" about extending *Terry* to possessory crimes because of the "danger that, instead of the stop being the object and the protective frisk the incident thereto, the reverse will be true."[31] As we explained in *G.B.*, Justice Brennan perceived a high risk that stops based solely on reasonable suspicion of possession "might simply be used as a pretext to conduct searches for evidence" that would otherwise require probable cause — *i.e.*, that an officer would initiate a stop based on reasonable suspicion of drug possession, knowing that the officer would likely be able to frisk the suspect for weapons (and thus potentially obtain corroborating evidence of possession).[32]

---

[29] *See Coleman v. State*, 553 P.2d 40, 45-47 & n.17 (Alaska 1976); *State v. G.B.*, 769 P.2d 452, 456 (Alaska App. 1989) (stating that *Coleman*'s "fundamental concern" was "the risk that an investigative stop based on mere suspicion may be used as a pretext to conduct a search for evidence").

[30] *G.B.*, 769 P.2d at 454; *see also Coleman*, 553 P.2d at 45 n.17.

[31] *Adams v. Williams*, 407 U.S. 143, 151 (1972) (Brennan, J., dissenting). The Second Circuit initially upheld the validity of the stop — a ruling from which Judge Friendly dissented. *Williams v. Adams*, 436 F.2d 30 (2d Cir. 1970). But upon rehearing en banc, the Second Circuit reached the opposite result and granted relief, with little explanation. *Williams v. Adams*, 441 F.2d 394 (2d Cir. 1971). The Supreme Court — with Justice Brennan dissenting — ultimately agreed with the initial panel decision by the Second Circuit. *Adams*, 407 U.S. 143.

[32] *G.B.*, 769 P.2d at 454; *Adams*, 407 U.S. at 153 (Brennan, J., dissenting) (stating that applying *Terry* to crimes like narcotics possession "will have opened the sluicegates for serious and unintended erosion of the protection of the Fourth Amendment" (quoting

(continued...)

This is because, once an officer has lawfully initiated an investigative stop, the officer may conduct a limited pat-down search for weapons *if* the officer reasonably believes that the suspect is armed and dangerous.[33] As we explained in *Erickson v. State*, there are multiple situations that could justify a pat-down search for officer safety during a lawful investigative stop — for example, "a characteristic bulge in the suspect's clothing," or "observation of an object in the pocket which might be a weapon," or "an otherwise inexplicable failure to remove a hand from a pocket."[34] The *Coleman* rule was designed to protect against pretextual stops in which an officer detains a person out of an expectation that the officer will ultimately be able to conduct a pat-down search that uncovers incriminating evidence.

But the risk of police engaging in such pretext to *expand* a stop, when a stop has already justifiably occurred, is not high enough to warrant an extension of *Coleman*'s unique prophylactic rule to these circumstances.[35] At that point, a person has already been subject to a valid police interference — and many of the justifications for conducting a pat-down search for officer safety will be readily apparent to the officer.

---

[32] (...continued)
*Williams*, 436 F.2d at 39 (Friendly, J., dissenting))); *see also Albers v. State*, 38 P.3d 540, 542 (Alaska App. 2001) (explaining that while pat-down searches are justified to ensure officer safety, searches for evidence do not have the same justification, and thus require probable cause).

[33] *Free v. State*, 614 P.2d 1374, 1378 (Alaska 1980).

[34] *See Erickson v. State*, 141 P.3d 356, 360-61 (quoting 4 Wayne R. LaFave, *Search and Seizure* § 9.6(a), at 627-30 (4th ed. 2004)) (listing circumstances that could justify a pat-down search based on officer safety concerns).

[35] Indeed, in his dissent in *Adams*, Judge Friendly recognized that the risk of a pretextual stop is lower when the officer directly observes that "criminal activity may be afoot." *Adams*, 436 F.2d at 39 (Friendly, J., dissenting).

Authorizing an officer who has conducted a valid stop to ask questions about the presence of contraband — only when reasonable suspicion to do so exists — therefore does not raise the same heightened concerns about pretext that animated the supreme court's decision in *Coleman*. Indeed, in *Skjervem*, we implicitly recognized that the police did not need a *Coleman*-level of suspicion in order to ask the defendant about the canister or request an opportunity to search the canister, *so long as* the defendant was still validly subject to an investigative detention pursuant to the initial investigation.[36] And following remand proceedings, in *Skjervem II*, we upheld the trial court's finding that the initial investigation had not yet concluded when the officer asked Skjervem about the canister in his vehicle — and thus, that Skjervem's consent to the search of his vehicle was not tainted by an illegal detention.[37]

Moreover, as we already noted, many jurisdictions allow police officers to ask questions unrelated to the reason for the stop without requiring *any* reasonable suspicion at all. By requiring reasonable suspicion of criminality before an officer may ask questions about other crimes — a standard that we conclude strikes the appropriate "balance between a person's interest in immunity from police interference and the community's interest in law enforcement"[38] — we are already more protective than many other jurisdictions.

---

[36] *Skjervem v. State*, 215 P.3d 1101, 1109 (Alaska App. 2009) (*Skjervem I*) (acknowledging that, if the police still reasonably believed that they had interrupted a burglary, "the continued detention of Skjervem would have been justified, and the police could presumably question Skjervem and seek his consent for a search of his vehicle").

[37] *Skjervem v. State*, 2011 WL 4108186, at *2 (Alaska App. Sept. 14, 2011) (unpublished) (*Skjervem II*).

[38] *Coleman v. State*, 553 P.2d 40, 46-47 (Alaska 1976).

We therefore decline Duty's invitation to extend *Coleman* to an officer's limited questioning about other crimes during the course of a traffic stop that is already in progress. Instead, we hold that such questions are permitted so long as they are supported by reasonable suspicion of criminality and do not unreasonably extend the duration of the stop.

*Why we conclude that Duty's consent to search was voluntary*

As we noted at the beginning of our discussion, Duty's central claim is that his consent to search was involuntary. Duty's arguments on this point largely rely on his claim that the trooper was not allowed to ask whether there was anything illegal in the car, and that those questions rendered the stop inherently coercive. As we have just explained, those questions were permitted, and Duty's argument on this point is therefore without merit.

To the extent Duty is arguing that his consent was involuntary for some other reason, we note that Duty volunteered that the officer could search his car on his own initiative. As one court has aptly noted, "It is difficult to conceive of the consent merely being an acquiescence to the commanding presence of the police when the idea for the search originated with the persons being detained."[39] Indeed, the district court stated that, after listening to the audio recording of the interaction between Duty and the trooper, the court was left with the distinct impression that Duty agreed to the search precisely because he did not think there were any drugs in the vehicle.

We see no error in the district court's conclusion that Duty's consent was voluntary.

---

[39] *Doering v. State*, 545 A.2d 1281, 1290 (Md. App. 1988); *see also* 4 Wayne R. LaFave, *Search and Seizure* § 8.2(g), at 129 n.257 (6th ed. 2020) (collecting cases that have stated the same).

*Conclusion*

The judgment of the district court is AFFIRMED.